## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| RYAN SHEA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:16-cv-01155-TMP |
| | ) | |
| KOHL'S DEPARTMENT | ) | |
| STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This cause is before the court on the motion for summary judgment filed March 30, 2018, by the defendant, Kohl's Department Stores, Inc. ("Kohl's" or "Defendant"). (Doc. 124). Defendant seeks dismissal of all of Ryan Shea's ("Plaintiff" or "Shea") claims arising from the Defendant's alleged retaliation in violation of the Sarbanes-Oxley Act and defamation under Alabama state law. The motion has been fully briefed. A hearing on the motion was held on October 2, 2018. The parties consented to dispositive jurisdiction by a magistrate judge on September 28, 2016. (Doc. 22).

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry

of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 246. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a

claim must be "substantial,"  <u>Marcus v. St. Paul Fire and Marine Ins. Co.</u>, 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  <u>Young v. City of Palm Bay</u>, 358 F.3d 859, 860 (11th Cir. 2004); <u>Kesinger ex rel. Estate of Kesinger v. Herrington</u>, 381 F.3d 1243, 1249-50 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); <u>Lewis v. City of West Palm Beach, Fla.</u>, 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249 (citations omitted); <u>accord</u> <u>Spence v. Zimmerman</u>, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  <u>Anderson</u>, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of

every reasonable inference.  <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

## SUMMARY JUDGMENT FACTS

Viewing the facts in the light most favorable to the nonmovant, in this case the plaintiff, the following facts are relevant to the motion for summary judgment.

The plaintiff, Ryan Shea, began his employment with Kohl's on April 3, 2006.  He worked as the District Manager for District 78, which consisted of a group of 16 stores in the Alabama and Georgia.  Shea worked in that capacity until his termination on October 16, 2015.  During the year 2015, Shea was the second-highest ranked District Manager for Kohl's nationwide, and the most highly ranked District Manager in the region.[1]  In both his 2014 and 2015 performance reviews, Plaintiff was ranked as "Highly Effective" or "Satisfactory" in all categories by Regional Vice President Phil Smith.  In April of 2015, Regional Vice President Roland Johnson ("Johnson") became Shea's new supervisor.

Shea had a history of being blunt and was considered "undiplomatic" in his relations with peers and subordinates.  In 2010, Shea was counseled to communicate with his peers "in a more professional manner."  In 2011, he was advised to be more aware of the impact his actions have on others.  And, in his 2013 performance review, Shea's supervisor, Regional Vice President Phil Smith,

---

[1]  In Kohl's hierarchy, stores are organized into districts, each overseen by a District Manager, and districts are organized into regions, managed by a Regional Vice President for each region.

challenged him to "adapt [his] tone and style appropriately" to be less "direct [and] opinionated" and more diplomatic. Even so, Shea received performance evaluation ratings of either "Satisfactory" or "Highly Effective" in the areas of "Build Great Teams" and management skills.

In the eleven months prior to his termination, Shea was disciplined for angry and intimidating treatment of other Kohl's employees on two more occasions. In November 2014, Shea was issued a verbal warning by his Regional Vice President, Phil Smith, for referring to a Kohl's co-worker as a "fucking moron" and "a fucking idiot." Notwithstanding this verbal warning, Smith rated Shea "Highly Effective" in the area of "Build Great Teams" for the year 2014. In April 2015, Shea's new Regional Vice President, Roland Johnson, received a complaint that Shea had intimidated and belittled another employee, Tracey Phillips, at a dinner. After investigation, Johnson issued Shea a written warning on June 19, 2015, for mistreating Phillips, using abusive and offensive language directed at her, and for "improperly submitting travel expenses for reimbursement."[2] Shea was explicitly warned by Johnson that further instances of misbehavior could result in the termination of Shea's employment.

---

[2] Shea was accused of seeking reimbursement for alcoholic drinks during the dinner with Phillips. Shea asserted that the inclusion of the alcoholic drinks on the reimbursement request was an error by his administrative assistant.

Kohl's keeps a record of the number of times customers apply for credit in each of its stores. One of the performance metrics by which stores are evaluated is the number of credit applications submitted each day. Daily credit-application goals are assigned to each store and, collectively, to each district, which are monitored by district managers in reports delivered three times each day. Whether the applications are accepted and credit is extended does not affect the evaluation. Occasionally, Kohl's will offer a small monetary incentive of around $1.00 per application to encourage the sales associates to ask each customer about opening a credit card account. Additionally, store manager bonuses are tied to the store's performance on the credit solicitation metrics.

Executives, including store managers, district managers, and others, are able to view reports of the number of credit applications submitted by each of the stores. This allows executives to see the number of credit applications for a particular day and the outcome of the applications, whether approved, denied, unable to process, or pending. It is rare for the final outcome of a credit application to be "unable to process." High numbers of credit applications that are not able to be processed may indicate a problem within the store. In addition to tracking the number of credit applications submitted at each store, Kohl's also keeps a record of the number of credit applications in relation to the dollar amount of sales at a given store in a given day. On average, Kohl's stores report one credit

application for every $2,500 to $3,000 in sales. A low "sales-to-credit application" ratio can also indicate a problem at the store.

During his tenure as District Manager, Kohl's conducted credit card application fraud investigations at four stores in Shea's district: Mobile, Alabama; Opelika, Alabama; Columbus, Georgia; and Albany, Georgia. As a result of an investigation in Opelika, Alabama, Shea terminated three employees for submitting fraudulent credit applications without the knowledge or consent of the customers in whose names the applications were made. This was not a problem exclusive to Shea's district; fraudulent credit card applications were a problem at Kohl's stores nationwide. Timothy Eger ("Eger"), the Assistant Manager of Credit Operations at the relevant time, stated that part of his job was to monitor the credit card applications submitted in the stores to determine if there was questionable activity. If questionable activity was detected, Eger would send an email to the District Loss Prevention Manager. From April 17, 2014, to December 1, 2015—a period of twenty months—70 such emails were sent to District Loss Prevention Managers to notify them of questionable applications at 48 stores. But the problem was growing worse. From February 11, 2016, to October 20, 2016—a period of only eight months—80 emails were sent regarding suspicious activity at 47 stores.[3]

---

[3] Notably, this period was after Shea was terminated on October 15, 2015.

Credit applications by customers of Kohl's were submitted to a bank, Capital One, which provided the credit if the application was approved. Applications were transmitted from Kohl's to Capital One over the internet. In assessing each application, Capital One obtained a credit report for the applicant, which resulted in a "hard inquiry" or a "hit" on the customer's credit-report record.

In September 2015, Shea began receiving reports from store managers within District 78 that certain stores were creating fraudulent credit applications to increase reported numbers. He became aware that the store in Albany, Georgia ("Albany Store"), particularly, was recording high numbers of credit applications tagged "unable to process." This was a store added to Shea's district in April 2015, as the result of a corporate restructuring. The Albany Store also had a low sales-to-credit application ratio. At one point, the Albany Store reported one credit application for every $96.00 in sales, compared to the usual average of one application for every $2,500 to $3,500 in sales. The numbers concerned Shea, and he ultimately discovered that sales associates at the Albany Store were submitting fraudulent credit applications using the social security numbers of customers and other people without authorization. The intended purpose of the transactions was to increase the credit applications on Kohl's corporate measurements, thereby increasing the perceived performance of the store.

Upon making this discovery, Shea sent an email to Paulette Williams ("Williams"), the manager of the Albany Store on September 18, 2015. He notified Williams of his concerns, noting that, in addition to the high number of credit applications and the low sales-to-credit application ratio, applications for credit were being submitted in "back-to-back" transactions. Shea asked Williams to investigate the issue and report back to him. Also on September 18, 2015, Shea notified Jason Deaton ("Deaton"), the District Loss Prevention Manager, of the situation at the Albany Store. Deaton informed Shea that the Kohl's Fraud Department was involved in the investigation, and he referred to the situation as "shady." On September 24, 2015, Deaton also received an email from Eger notifying him of the questionable activity in the Albany store.

Williams was "disturbed" by the email from Shea about the credit card applications and she forwarded it to her former district manager, Brent Emmett, on September 19, 2018. Emmett forwarded the email on that same date to Roland Johnson, the Regional Vice President over Shea's district. Johnson was thus aware that Shea was questioning the legitimacy of credit applications in the Albany store by no later than September 19. On September 28, 2015, Williams submitted a "statement of concern" to Johnson detailing her allegations against Shea, including the assertion that he made racial statements to her about the demographics of the

Albany store.[4]  Williams' "statement of concern" also complained that Shea was questioning her store's efforts to solicit credit applications.  On September 29, 2015, Johnson communicated with Human Resources about issues with Shea including "credit integrity challenges" being raised by Shea, apparently with respect to the Albany store.  On October 13, 2015 Roland Johnson met with Shea about Williams' allegations and informed Shea that there was an investigation into the matter.  Shea reminded Johnson at that time of the ongoing fraud investigation of the Albany Store.  Shea opined that Williams' complaint about him was an attempt to retaliate against him for a store visit he conducted five months earlier and because of the fraud investigation.  Johnson instructed Shea to prepare a written memorandum about the fraud allegations, which he did that day.  Shea's employment with Kohl's was terminated on October 16, 2015, by Roland Johnson, with input from Jolene Christensen and Tim McLarty.

At the conclusion of the fraud investigation by Kohl's and Deaton, it was determined that fraud was, in fact, occurring in the Albany Store. While most

---

[4]  Viewing this evidence favorably to the plaintiff, Shea asserts that, during a visit to the Albany store in April 2015, five months before he questioned credit applications at the store, he noticed that the Keurig coffeemakers in the store were not simple black and white, but were colorful.  He asked Williams whether that was an "African-American thing."  Shea testified that he was inquiring whether colorful coffeemakers were a "localization" effort by the store, which had a high number of African-American customers.  Kohl's admits that it had a "Localization" Policy, under which the inventory of stores is tailored to meet the demographics of each store's particular customer population.  While Kohl's admits that it has a Localization effort aimed at Hispanic customers, it has never had such an effort focused on African-American customers, even though Shea's former Regional Vice President, Phil Smith, considered the idea.

fraudulent credit applications were rejected by Capital One, at least one such fraudulent application resulted in the issuance of credit on which a Kohl's customer reported being dunned for about $300.00 in debt and fees. In every instance, however, the fraudulent credit applications resulted in a "hard inquiry" or "hit" on the credit report of each customer, potentially impacting the customer's credit score. The two employees involved in the scheme were "counseled" about the wrongness of their actions, but both were allowed to remain employed with the company at that time. One was later terminated when she continued to submit fraudulent credit applications.

More than a year later, on October 31, 2016, JC Penney flew Shea to Dallas, Texas for a series of interviews for a position with the company. He interviewed with a former Kohl's employee, Melissa Liegl. After the interview, at approximately 10:00 a.m. on October 31, 2016, Liegl contacted Courtney Kolar and Kristin Moran for their opinions on Shea. Liegl knew Kolar and Moran because they had all worked together at Kohl's. Kolar had left Kohl's some time before October 31 and was working at JC Penney at the time of the text message from Liegl. Moran had submitted a two-week notice to Kohl's that morning at 8:34 a.m., informing Kohl's that she was leaving to take a job with JC Penney. Because she had taken a job with JC Penney, however, she was escorted out of the building that day before 9:00 a.m. Liegl cannot remember whether it was Moran

or Kolar or both who provided her with opinions about Shea. Liegl summarized the report(s) she received in an email to Brett Romero and Cecil James, two other JC Penney interviewers, at 11:54 a.m., October 31, 2016, in which she said Shea was not "HR friendly" and had "integrity issues." After this first day of interviews, JC Penney contacted Shea to inform him that he was no longer a candidate and that his remaining interviews had been cancelled.

## DISCUSSION

Kohl's has moved for summary judgment on all of the Plaintiff's remaining claims under the whistleblower protections of Sarbanes-Oxley ("SOX") and Alabama state law of defamation. In its motion for summary judgment Kohl's sets forth the following arguments:

> Shea did not engage in activity protected under Sarbanes-Oxley, the relevant decision makers did not know of his purported protected activity, and his internal "complaint" was not a contributing factor in his termination. Moreover Kohl's would have fired Shea in light of his sustained bullying of peers and subordinates. Finally, Shea cannot point to any employee who communicated with JC Penny [sic] about the termination of his employment, nor can he show that any such statement was false when made.

(Doc. 124, p. 1). The court understands Kohl's to be raising the following bases for summary judgment:

1.   Whether Shea's actions regarding his suspicion of credit-application fraud at the Albany store constituted "protected activity" under the SOX whistleblower provision;

2.   Whether the supervisors at Kohl's who decided to terminate Shea's employment knew of his alleged protective activity under SOX at the time they made the decision;

3.   Whether Shea's actions related to the suspicion of credit-application fraud at the Albany store was a contributing factor in the decision to terminate his employment;

4.   Whether Kohl's can establish with clear and convincing evidence that it would have taken the same action against Shea notwithstanding any protected activity under SOX;

5.   Whether any statement about Shea made to JC Penney was made by a Kohl's employee with authority to speak on behalf of Kohl's; and

6.   Were the statements made to JC Penney about Shea false.

## I.   The Sarbanes-Oxley Act

Section 806 of the Sarbanes-Oxley Act ("SOX") makes it unlawful for a publicly traded company to "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against any employee" because the employee engaged in whistleblowing or other activity protected by the Act.   18 U.S.C.

§ 1514A(a)(1).   Activity protected by the Act includes "provid[ing] information, caus[ing] information to be provided, or otherwise assist[ing] in an investigation regarding conduct which the employee reasonably believes constitutes a violation [of criminal statutes involving mail, wire, bank, or securities fraud; a rule or regulation of the SEC (Securities and Exchange Commission); or a provision of law prohibiting fraud against shareholders] …when the information or assistance is provided to or the investigation is conducted by… a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)…." Id; Johnson v. Stein Mart, Inc., 440 F. App'x 795, 800-1 (11th Cir. 2011) (citing Day v. Staples, Inc., 555 F.3d 42, 54-5 (1st Cir. 2009).  To make out a *prima facie* case for retaliation under SOX, therefore, a plaintiff must show by a preponderance of the evidence that "(i) the employee engaged in a protected activity or conduct; (ii) the [employer] knew or suspected, actually or constructively, that the employee engaged in the protected activity; (iii) the employee suffered an unfavorable personnel action; and (iv) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action." Johnson v. Stein Mart, Inc., 440 F. App'x 795, 800-1 (11th Cir. 2011) (citing 29 C.F.R. § 1980.104(b)(1); Gale v. U.S. Dept. of Labor, 384 F. App'x 926, 929 (11th Cir. 2010)).   Once a plaintiff has made a *prima facie* showing of

whistleblower retaliation under SOX, the burden shifts to the employer. Id. Unlike other burden-shifting frameworks, the burden on the employer under SOX is a true burden of proof, not mere articulation of a non-retaliatory reason for the personnel action taken. Id. (quoting Welch v. Chao, 536 F.3d 269, 275 (4th Cir. 2008); citing 18 U.S.C. §1514A(b)). The employer must rebut the plaintiff's *prima facie* case "'by demonstrating by *clear and convincing evidence* that the employer would have taken the same personnel action in the absence of the protected activity.'" Id. (quoting Welch v. Chao, 536 F.3d 269, 275 (4th Cir. 2008); citing 18 U.S.C. §1514A(b)) (emphasis added).

### A. *Prima Facie Case*

There is no dispute that Kohl's is a publicly traded company, and therefore, subject to the provisions of SOX, including the anti-retaliation provision of Section 806. (See Doc. 124-2, p.1; Doc. 43, p.1). Where the dispute arises is whether Shea has made out a *prima facie* case of whistleblower retaliation under SOX. Of the *prima facie* elements, the parties have not disputed that termination of employment is type of adverse employment action that can trigger the protections of Section 806. The issue before the court is whether (1) Shea engaged in protected activity, (2) the decision makers were aware of the protected activity when they made the decision to fire Shea, and (3) the circumstances raise the inference that the protected activity was a contributing factor in the decision to

terminate Shea's employment.  Construing all facts in favor of the nonmovant, as the court must at this juncture of the case, the court finds that Shea has made a *prima facie* case of retaliation under SOX.

1. <u>Protected Activity</u>

First, a reasonable jury could find that Shea engaged in activity that is protected under Section 806 of the Sarbanes-Oxley Act.  SOX prohibits retaliation against an employee who provides information, causes such information to be provided , or assists in an investigation into conduct that the employee <u>reasonably believes</u> is prohibited by the Act, and where the information or assistance is provided to a supervisor or other employee with authority to investigate.  18 U.S.C. § 1514A(a)(1).  The Eleventh Circuit has held "reasonably believes" means that the plaintiff "actually believed the conduct complained of constituted a violation of pertinent law" (*i.e.* had a subjective belief) and that the plaintiff's belief was objectively reasonable on the facts and circumstances of the case. <u>Gale v. Dept. of Labor</u>, 384 F. App'x 926, 929-30 (11th Cir. 2010) (citing <u>Welch v. Chao</u>, 536 F.3d 269, 275 (4th Cir.2008), <u>cert. denied</u>, 556 U.S. 1181, 129 S. Ct. 1985, 173 L. Ed. 2d 1084 (2009).

Kohl's does not dispute that submitting fraudulent credit card applications, as possible wire fraud or bank fraud, is a type of conduct that can trigger the whistleblower protections of the Act.  18 U.S.C. § 1514A (a)(1).  Rather, the

dispute in the briefs stems from whether Shea had a reasonable belief that he was reporting illegal conduct. Additionally, during the motion hearing, defendant argued that Shea had not engaged in protected activity because he did not notify his supervisor pursuant to Kohl's policy.

To the extent that the defendant argues that Shea did not provide information to the appropriate person in order to be protected under Section 806, the court finds that he did. Shea provided his information calling attention to the suspicious activity at the Albany store to Jason Deaton, the District Loss Prevention Manager, on September 18, 2015. Timothy Eger, who was serving as Assistant Manager of Credit Operations at the relevant time, testified during his deposition that his team monitored credit applications for suspicious activity and sent an email to the District Loss Prevention Manager when suspicious activity was noticed. The District Loss Prevention Manager had the authority to investigate the misconduct. Therefore, while the court admittedly does not know all of the inner reporting channels within the Kohl's organization, there is substantial evidence in the record that reporting his suspicions to the District Loss Prevention Manager was an appropriate course of action for Shea.

Also, the court finds that there is a genuine issue of material fact regarding whether Shea had a "reasonable belief" that illegal activity was occurring. Defendant argues that the plaintiff did not make his complaint in good faith and

did not have a subjective belief that illegal conduct was occurring as evidenced by the timing of his complaint, the deviation from his prior investigations, and the "vague and ambivalent" language he used when reporting the suspicious activity. (Doc. 124-2, p. 21). In <u>Gale</u>, however, the Eleventh Circuit assessed the validity of the plaintiff's belief in a fact-intensive analysis. In that case, the court was able to rely on statements from the plaintiff that he didn't believe that illegal or fraudulent activities were occurring when he reported it and that he felt "uncomfortable" and "uneasy" about what was occurring. The instant case does not present such clear cut evidence that the whistleblower did not believe the fraudulent credit applications were illegal. Shea testified that he did believe it was fraud, and this was based on his prior experience with credit application frauds. Not surprisingly, when Deaton was notified of Shea's suspicions, he described the activity at the Albany store as "shady," an acknowledgment that he too believed something illegal was afoot. As the court has previously opined, a whistleblower need not have the legal sophistication of a criminal prosecutor to believe in good faith that he is reporting something illegal. He is not required to be able to cite the chapter and section of the criminal code implicated by his suspicions.[5] Whether, in fact,

---

[5] It is true that SOX limits its whistleblower protections to reports of certain types of crimes, such as wire fraud, bank fraud, and securities fraud. This limits the objective scope of the application of SOX, but it does not define the level sophistication a whistleblower must possess to make a good faith report of illegal activity. The whistleblower is not required to cite to 18 U.S.C. § 1343 in order to show his good faith. Rather, he acts in good faith if he believes what he is reporting is illegal regardless of whether he can identify the particular code section at issue.

Shea believed the conduct to be illegal is a question for the jury, and there is substantial evidence in the record on which a reasonable jury could find that he did believe the activity he was reporting was illegal.

As to the *objective* reasonableness of the plaintiff's belief, Kohl's apparently does not dispute that the conduct Shea was suspicious of, in fact, was wire or bank fraud. Because, in fact, the credit application fraud *was* illegal, Shea's belief was objectively reasonable. When he reported the conduct to Williams, the store manager, and Deaton, the District Loss Prevention Manager, Shea not only believed the activity to be illegal, it was in fact illegal. Therefore, the court finds for the purposes of summary judgment that there is a genuine issue of material fact surrounding whether the plaintiff had a "reasonable belief" and thus, whether he engaged in activity protected under the Act. Therefore, the court declines to grant summary judgment on this ground.

2. <u>Knowledge of the Decisionmakers</u>

Second, there is substantial evidence on which a reasonable jury could find that Roland Johnson was aware of the plaintiff's protected activity when he concluded that Shea should be fired. If Johnson, Christensen, or McClarty were unaware of the reporting, then the defendant would be entitled to summary

---

If the reported illegality actually falls outside the limited scope of laws on which whistleblower protection is provided by SOX, the protection does not exist. If the illegality falls within the scope of laws covered by SOX, protection exits regardless of whether the whistleblower knew it or not.

judgment on the plaintiff's SOX claim.  See Johnson, 440 F. App'x at 800-1. However, there is evidence in the record that demonstrates that Johnson was aware of Shea's investigation into the credit application scheme in the Albany store well before October 13, 2015.  On September 18, 2015, Shea sent an email to Paulette Williams inquiring about credit card applications in the Albany store. Williams forwarded this email to Brett Emmett, who forwarded it to Roland Johnson on September 19, 2015. Therefore, Johnson knew of Shea's investigation into the matter on September 19, 2015.  Even if the court were to accept Johnson's assertion that he made the decision to fire Shea on October 7, 2015, Johnson still was aware of Shea's internal reporting at the time that he made the decision to terminate Shea's employment.  Therefore, because there is evidence on which a reasonable jury could find that the relevant decision makers were aware of Shea's protected conduct when they made the decision to fire him, summary judgment is not proper on this ground.

3. Contributing Factor

Third, a reasonable jury could find that Shea's complaint was a contributing factor in the decision to terminate his employment.  To establish a *prima facie* case of retaliation under SOX, the plaintiff must show that his reporting of violations was a contributing factor in the employer's decision to terminate him.  See Johnson, 440 F. App'x at 800-1.  A "contributing factor" is "any factor, which

alone or in combination with other factors, tends to affect in any way the outcome of the decision." Feldman v. Law Enf't Assocs. Corp., 752 F.3d 339, 348 (4th Cir. 2014); Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dept. of Labor, 717 F.3d 1121, 1136 (10th Cir. 2013). This creates a standard which is broad and forgiving. Feldman, 752 F.3d at 348. Close temporal proximity between an employee's protected activity and an adverse employment decision can be circumstantial evidence of a retaliatory motive. Feldman, 752 F.3d at 348; Brungart v. BellSouth Telecom., Inc., 231 F.3d 791, 799 (11th Cir. 2000); Tice v. Bristol-Myers Squibb Co., 2006 WL 3246825, at *20 (U.S. Dept. of Labor 2006).

In this case, Shea first reported his concerns about the credit card applications at the Albany store on September 18, 2015. The next day, Williams complained to her former district manager that Shea was raising questions about efforts in her store to solicit credit applications. That complaint was forwarded to Johnson, who knew by September 19 that Shea was raising questions about the legality of credit applications in the store. Also, Williams later met with Johnson and complained again about Shea's credit integrity questions. When Johnson first communicated with Courtney Kolar in HR about Shea on September 29, 2015, one of the concerns he reported was Shea's "consistent credit integrity challenges." (Doc. 124-13, p. 124). This is circumstantial evidence, but substantial evidence, on which a reasonable jury could find that Shea's complaint about fraudulent credit

applications at the Albany store was a contributing factor in Johnson's treatment of him. One of the very bases for discipline cited by Johnson to HR was Shea's protected activity—his "consistent credit integrity challenges."

Moreover, the temporal proximity between Shea's protected activity and his termination is circumstantial evidence that his complaint was a contributing factor in his termination. Shea was terminated by Kohl's on October 15, 2015, less than a month after he emailed Paulette Williams and Jason Deaton about his suspicious of credit application fraud. The abbreviated timeline on which these events occurred is circumstantial evidence of retaliation.

The court finds sufficient circumstantial evidence to create a genuine issue of material fact such that summary judgment is precluded. Because there are genuine issues of material fact as to whether plaintiff engaged in protected conduct and whether his reporting was a contributing factor to his termination, the court finds that, for the purposes of summary judgment, the plaintiff has made out a *prima facie* case of retaliation under SOX.

### B. *Employer's Rebuttal*

Because the plaintiff has made out a *prima facie* case for the purposes of summary judgment, the burden shifts to the employer to show by clear and convincing evidence that it would have terminated Shea regardless of his protected activity. See Johnson, 440 F. App'x at 801. If the employer can carry that burden,

then summary disposition is appropriate.  <u>See id.</u>  The defendant argues here that it would have fired Shea anyway because of his interpersonal and integrity issues, and the court should analyze this case under the framework of <u>Johnson</u>. (Doc. 124-2, 26-8).  Shea, on the other hand, contends that the defendant's proffered explanation for his termination is pretext for retaliation.  (Doc. 130, p. 26).

The defendant asserted at the motion hearing and in briefs that <u>Johnson v. Stein Mart Inc.</u> presents the same issues and should be extremely persuasive to the court.  Because the court disagrees that the instant case and <u>Johnson</u> are on all fours, a discussion of the facts of <u>Johnson</u> is warranted.  Plaintiff in that case was an employee of a publicly traded retail company.  <u>Johnson</u>, 440 F. App'x at 797. In 2002, after she was promoted to buyer in the women's department, she began making internal complaints about business practices that she viewed as inappropriate.  <u>Id.</u>  In 2003, she was moved to the position of planner, and while she viewed this as a demotion, she retained the same compensation package in both positions.  <u>Id.</u>  As part of her duties the plaintiff was responsible for making the purchases for the fragrance department which entailed no more than entering the data as she was directed by her superiors.  <u>Id.</u> at 798.  She did not have the discretion to change the order.  However, in the fall of 2004, plaintiff decided to deviate from the directions of supervisors and order different fragrances without

authorization. Id. Stein Mart alleged that this resulted in a discrepancy of about $384,000 and necessitated a supplemental order of fragrances. Id. As a result, plaintiff received performance counseling in December of 2004. Id. In February 2005, plaintiff received a negative evaluation, a "Final Warning," and was placed on a performance improvement plan. Id. Plaintiff's supervisor notified the plaintiff multiple times that her performance was not improving sufficiently to retain her job. Id. In March 2005, plaintiff met with the defendant's Chief Financial Officer and informed him that she believed she was the victim of retaliation. Id. The allegation was investigated and determined to be baseless. Id. On May 19, 2005, plaintiff was terminated. Id. She brought suit against her employer alleging retaliation in violation of SOX. Id. at 799. The District Court granted summary judgment in favor of the defendant, and after a remand because of another issue, the court reinstated the grant of summary judgment. Id. On the second appeal, the Eleventh Circuit affirmed on the grounds that, even if plaintiff had made a *prima facie* showing, summary judgment still was appropriate because the defendant had demonstrated by clear and convincing evidence it would have terminated her employment absent any reporting. Id. at 804.

In Johnson and in this case, both employers argued that they would have made the decision to terminate the employees even without the employee reporting. See id. at 799; (Doc. 124-2, p. 26-7). However, the case before the

court differs in important ways from <u>Johnson</u>, and a comparison of the two highlights outstanding issues of material fact and is illustrative that summary judgment is improper. First, the plaintiff in <u>Johnson</u> was given negative performance evaluations, <u>Johnson</u>, 440 F. App'x at 798, whereas Shea's performance was always rated "satisfactory" or above. Second, the timelines in the cases are completely different. The plaintiff in <u>Johnson</u> made her internal reports in 2002 and was not terminated until May of 2005. <u>Johnson</u>, 440 F. App'x 797-8. Shea made his reports in September of 2015 and was terminated less than one month later. Additionally, after the plaintiff in <u>Johnson</u> alleged that she was the victim of retaliation, her claims were investigated, and she was terminated two months later. <u>Johnson</u>, 440 F. App'x at 798. Shea alleged retaliation, there was no investigation, and he was terminated two days later.

Prior to his termination, Shea was a highly ranked and decorated employee. In 2015, he was the second most highly ranked Kohl's District Manager in the nation. (Doc. 130, p. 3). Additionally, in his performance review in April 2015, Shea received "satisfactory" or "highly effective" ratings in every category of evaluation. <u>Id.</u> He also was given a glowing personal review from Phil Smith, Shea's supervisor at the time. <u>Id.</u> Kohl's points to prior reviews from 2011 to 2014 where they claim Shea was "admonished," urged to improve, and warned, as evidence that Shea had long-term issues and failed to improve. (Doc. 131, p. 2).

However, looking at the plaintiff's 2015 evaluation, he was deemed to have improved. The positive 2015 personnel evaluation cuts against Kohl's assertion that they would have terminated Shea absent his protected activity. When compared with Johnson, a case where summary judgment was appropriate, the differences are clear. In Johnson, the plaintiff's most recent personnel evaluation had been negative, she had recently committed an ordering blunder valued at $384,000, and she was placed on a performance improvement plan and given 90 days to improve or be terminated. See Johnson, 440 F. App'x 797-8. Certainly, the plaintiff in Johnson was not ranked as one of the retailer's top employees or given a positive review immediately before her termination.

Additionally, the timelines in the cases demonstrate the appropriateness of summary judgment in Johnson but not in this case. The time from Shea's initial questioning of Williams on September 18, 2015, and Johnson's learning of Shea's reporting on September 19, 2015, until Shea's termination on October 15, 2015, was less than one month. Additionally, Johnson sent an email to Courtney Kolar in HR on September 29, 2015, effectively starting the discipline process less than two weeks after Shea reported the issues in the Albany Store, and in that email Johnson references the protected activity as an issue with Shea.

By contrast, the plaintiff in Johnson reported her concerns in 2002. She received a performance counseling in December 2004, was given a "Final

Warning" in February 2005, and was terminated in May 2005. As the Eleventh Circuit noted in Johnson, no reasonable jury could believe that they decided to go through the 90-day performance improvement plan to further delay terminating her if they were motivated by a desire to retaliate. On the contrary, in the instant case, a jury could believe that Shea's internal reporting set in course a plot of retaliation that led to his termination less than one month later.

In sum, the court finds that, for the purposes of summary judgment, the plaintiff has made out a *prima facie* case of retaliation under Section 806 of the Sarbanes-Oxley Act. Additionally, the defendant has not shown by clear and convincing evidence for purposes of summary judgment that it would have terminated the plaintiff's employment even if he had not engaged in protected activity. A reasonable jury may or may not believe Kohl's contention is true. As such, genuine issues of material fact remain and summary judgment is improper on Plaintiff's Sarbanes-Oxley Act claim. The defendant's motion is due to be denied.

## II.    Defamation

Defendant also has asserted that the plaintiff's claim for state-law defamation should be dismissed because he cannot show that a Kohl's employee communicated with JC Penney or, in the alternative, he cannot show that the statements were false. (Doc. 124-2, p. 26).

To state a *prima facie* case of defamation under Alabama state law, the plaintiff must show (1) that the defendant was at least negligent (2) when he or she published (3) a false and defamatory statement (4) about the plaintiff (5) who suffered special damages (unless the statement imputes a crime of infamy or moral turpitude).  Delta Health Group, Inc. v. Stafford, 887 So. 2d 887, 895 (Ala. 2004).  Evidence that shows that the statement was communicated to another is sufficient to establish the publication element of the claim.  See K-Mart Corp. v. Pendergrass, 494 So. 2d 600, 602 (Ala. 1986).  A corporation can be liable for defamation based upon the statements made by its agents that damage a third-party.  Hoover v. Tuttle, 611 So. 2d 290, 294 (Ala. 1992).  However, congruent with the basic principles of agency law, the agent must be acting within the scope of his or her employment at the time the statement is made.  Id.

The court finds that there are no remaining issues of material fact with regard to the plaintiff's defamation claim, and therefore, that the defendant's summary judgment motion is due to be granted on this count.  The court does not reach the argument of the truthfulness of the statements because it finds that neither Moran nor Kolar was acting as an agent of Kohl's at the time she communicated with Liegl.  Kolar resigned from Kohl's several months before the text messages about Shea.  The plaintiff argues that the defendant has failed to establish that Moran was no longer being paid by Kohl's.  However, the issue is

not whether Moran was still on Kohl's payroll. The issue is whether Moran was acting as an agent of Kohl's. Given that Moran was escorted out of the building prior to making any statement to Liegl, and further assuming it was even Moran that made the negative statements about Shea, it is clear that Moran was no longer acting within the scope of her employment. Therefore, the court finds that defendant's summary judgment motion is due to be granted as to the plaintiff's defamation claim.

## CONCLUSION

The court finds that the defendant's motion for summary judgment is due to be granted in part and denied in part. The court finds that there are  genuine issues of material fact as to Plaintiff's claim under the Sarbanes-Oxley Act, and the motion for summary judgment is due to be denied. Additionally, the court finds that the defendant's motion for summary judgment on Plaintiff's defamation claim is due to be granted because no reasonable jury could find in favor of the plaintiff. A separate order will be entered.

DONE  this 2nd day of April, 2019.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE